UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A CELLULAR DEVICE | Case No. 3:20mj208 (SALM) |

FEB 27 2020 PM 3:47
FILED-USDC-CT-NEW HAVEN

## AFFIDAVIT

I, Mark H. Roberts, a Special Agent of the Federal Bureau of Investigation, being duly

sworn, depose and state that:

## INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) or Title 18, United States Code, in that I am empowered by law to

conduct investigations and to make arrests for federal felony offenses, including but not limited

to drug and firearms offenses.

2.      I am presently employed as a Special Agent with the Federal Bureau of

Investigation (FBI) and have been since 1997. I have investigated a wide range of federal

violations and national security cases for over twenty-two years as an FBI agent in three FBI

field divisions. I have served as a field squad supervisor and a headquarters supervisor for nearly

six of those years. In the course of my duties as an FBI Special Agent, I have prepared affidavits

in support of applications for search warrants and arrest warrants and have executed numerous

search and arrest warrants.

3.      During my experience in law enforcement, I have participated in investigations of

diverse crimes, including investigations involving the illegal distribution of controlled

substances. In connection with these investigations, I have executed search and arrest warrants.

4.      I have also been involved in controlled purchases of illegal drugs utilizing

cooperating sources; conducted electronic and physical surveillance of individuals involved in illegal drug distribution; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.

5.      Based on my training and experience, I know that drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators, contraband, and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug trafficker's possession or in their residence, or are frequently stored electronically on wireless telephones, i-Pads, computers, and other electronic devices.  I also know that drug traffickers often use multiple phones to facilitate their illegal activities.  Drug traffickers will utilize multiple phones in an effort to conceal their identities as well as to separate customers and sources of supply.  Drug traffickers will frequently change cellular devices and cellular numbers to avoid detection by law enforcement.  Drug traffickers utilize their phones and various phone related features and applications, such as messenger and text messaging, to contact each other and arrange drug transactions.  Drug traffickers often subscribe these phones in fictitious names and at fictitious addresses in an effort to conceal their identities and connection to the phones. Drug traffickers frequently store the contact information for criminal associates in their phones, often under an alias.   Drug traffickers will also access internet-based applications such as Facebook, in furtherance of their trafficking activities.  Drug traffickers will also utilize their

phones' GPS or location services to arrange meetings and to find meet locations for the purpose of conducting narcotic transactions.

## REQUEST

6.   . I am one of the case agents involved in the investigation that is the subject of this affidavit and have personally participated in the investigation concerning violations of the federal laws listed herein.  The information contained in this affidavit is based on my personal involvement in this investigation, information provided by other law enforcement officers who participated in this investigation and were present during the events described herein, on information developed through controlled narcotics purchases, physical surveillance by investigators, information provided by multiple confidential informants, on analysis of cellular phone data, on review of department of motor vehicle records, court records, and other public records, and on my and other investigators' experience and training.  I am thoroughly familiar with the information contained herein.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are essential to establish probable cause to support the issuance of the search warrant.

7.   This affidavit is submitted in support of an application for a search warrant for a cellular telephone and its contents, which was seized from Robert HALL (HALL) on February 22, 2019.  The cellular telephone is identified in Attachment A and herein as follows:  one Apple iPhone inside a red and black case, which was seized on February 22, 2019 from Robert HALL (hereafter referred to as "Target Device 9"), that is presently in FBI's custody.

8.   Target Device 9 has been maintained with the FBI Baltimore Division since it was seized on February 22, 2019.  FBI New Haven obtained custody of Target Device 9 on February 4, 2020 and it is currently stored at the FBI Office in New Haven, CT.

7.     With respect to Target Device 9, the applied-for warrant would authorize the forensic examination of Target Device 9, including accessing all internal applications within Target Device 9, for the purpose of identifying electronically stored data particularly described in Attachment B.

8.     For the reasons set forth herein, I have probable cause to believe and I do believe that the contents and records of this cellular telephones, Target Device 9, contains evidence, contraband, fruits, or instrumentalities of violations of conspiracy to possess with the intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Sections 841 and 846 (hereafter referred to as the "Target Offense").

## PROBABLE CAUSE

9.     As outlined below, intercepted communications, including communications intercepted over a phone held by HALL (860-460-2660), evidence HALL's membership in a drug trafficking organization and his commission of the Target Offense.  On February 19, 2019, HALL was charged by criminal complaint for the Target Offense and a warrant was issued for his arrest.

10.     On February 20, 2019, law enforcement attempted to execute the arrest warrant issued for HALL, but he could not be located.  Officers visited one of HALL's known addresses and spoke with his grandmother.  Under law enforcement direction, HALL's grandmother placed a call to a number associated with HALL (860-941-3405) and listened to the call.  HALL's grandmother advised him that the police had an arrest warrant for him and asked for him to surrender. HALL told his grandmother that he would not turn himself in and would not answer any additional phone calls from her.  Law enforcement then called the phone number 860-941-3405 and left a message but did not receive a call back.  On or about February 21, 2019, the

Honorable U.S. Magistrate Judge Robert M. Spector authorized a search warrant for location information for the second phone number associated with HALL (860-941-3405) to track HALL.

11.     Law enforcement subsequently determined that HALL fled Connecticut.  He was located and arrested in Delaware on February 22, 2019.  Following HALL's arrest, he told the arresting agent that his cell phone was on the kitchen table.  Law enforcement found an Apple iPhone with a red and black case, Target Device 9, on the kitchen table.  When the phone was presented to HALL, he positively identified the phone as his phone.

12.     On March 5, 2019, a federal grand jury returned an indictment charging HALL with conspiracy to distribute and possess with the intent to distribute heroin, 28 grams or more of cocaine base, and 500 grams or more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and 846.[1]

*Overview and Court Authorizations*

13.     In June 2018, law enforcement began an investigation into HAROLD BUTLER and other members of the Norwich Bloods Street Gang affiliate based out of Norwich, Connecticut.  As part of this investigation, law enforcement conducted numerous controlled purchases of cocaine base from BUTLER, gathered intelligence from reliable cooperating sources, conducted physical surveillance, seized narcotics, utilized pen registers and precision location information, as well as lawfully intercepted communications over telephones held by BUTLER, HALL, and KAREEM SWINTON.

14.     The wiretap phase of this investigation commenced on September 13, 2018, when the Honorable Robert N. Chatigny, United States District Judge, signed an order authorizing the

---

[1] In April 2019, the Honorable United States Magistrate Judge Robert A. Richardson granted the Government's request for eight cellular telephones seized in this investigation.  Given the volume of warrants sought and case resolution discussions at that time, the Government did not request a warrant for the phone recovered from HALL.

interception of wire and electronic communications occurring over a cellular telephone identified in the investigation as Target Telephone-1. Monitoring of Target Telephone-1 commenced on or about September 13, 2018, and ceased on October 12, 2018. BUTLER is the holder and user of Target Telephone-1.

15.     On October 18, 2018, the Honorable Robert N. Chatigny, United States District Judge, signed an order authorizing the interception of wire and electronic communications occurring over a cellular telephone identified in this investigation as Target Telephone-2 (860-460-2660). Monitoring of Target Telephone-2 commenced on or about October 18, 2018, and ceased on November 15, 2018. HALL is the holder and user of Target Telephone-2.

16.     On November 27, 2018, the Honorable U.S. District Court Judge Robert N. Chatigny authorized the interception of wire and electronic communications occurring over a phone utilized by SWINTON, identified in the investigation as Target Telephone-3.

17.     On November 29, 2018, law enforcement learned that SWINTON had changed the phone number for Target Telephone-3. Law enforcement also realized an error in the original authorization in that the number listed as an IMEI in the documents supporting the November 27, 2018 authorization was actually an IMSI. Accordingly, reauthorization for continued interception was obtained to properly identify the IMSI number as an IMSI rather than an IMEI. When the error regarding the IMSI was identified on November 30, 2018, interception ceased.[2]

18.     On November 30, 2018, the Honorable U.S. District Judge Robert N. Chatigny reauthorized the interception of wire and electronic communications occurring over Target Telephone-3 reflecting the replacement phone number for Target Telephone-3 and correctly

---

[2] Communications intercepted pursuant to the November 27, 2018 authorization are not set forth herein.

identifying the IMSI as an IMSI.  Monitoring of Target Telephone-3 recommenced on November 30, 2018 following the court's amended order and terminated on December 26, 2018.

19.     On January 2, 2019, the Honorable U.S. District Judge Robert N. Chatigny issued an Order authorizing the continued interception of wire and electronic communications occurring over Target Telephone-3.  Monitoring of Target Telephone-3 commenced on January 3, 2019, and terminated on January 24, 2019.

20.     On January 24, 2019, the Honorable U.S. District Judge Robert N. Chatigny authorized the continued interception of wire and electronic communications occurring over Target Telephone-3, as well as the initial interception of wire and electronic communication occurring over an additional phone identified in the investigation as Target Telephone-4, also being utilized by SWINTON.  Monitoring of Target Telephone-3 and Target Telephone-4 pursuant to the January 24, 2019 Order commenced on January 25, 2019 and, with respect to Target Telephone-3, terminated on February 21, 2019.[3]

### Use of Cellular Devices

21.     Intercepted communications, as described in more detail below, revealed that SWINTON, HALL, BUTLER, and others were involved in the commission of the Target Offense.  The intercepted communications referenced coded terminology commonly used in the heroin trade and cocaine base trade, as well as corresponding prices consistent with the quantities of these drugs referenced.

22.     To begin, we intercepted calls in which SWINTON and his coconspirators utilized common coded terminology or slang to refer to narcotics during conversations over cellular devices.   For instance, on December 8, 2018, at 11:07 EST in session 766 intercepted

---

[3] Shortly after the January 24, 2019 Order, SWINTON discontinued his use of Target Telephone-4.

over Target Telephone-3, SWINTON spoke to S.T.  During the call, the following exchange

occurred:

> KS: So I asked this corny nigga, I say yo, tell me what this is, right? Before I buy it right?
> ST: Yeah
> KS: He tell me, oh that shit's good bro, buy it, Shit was pure garbage, right? You hear me?
> ST: Why would he do some shit like that? No, I'm just stuck on why, like what's wrong with people man?
> KT: So, boom, right? Now, is the, is the ingredient that he had right?
> SS: Yeah
> KT: My people's mad, I'm going through a transition with my people's and make them get it from me, right?
> ST: Ok, I hear you
> KS: So I get this shit, right? This shit fire! Nigga gonna tell me it's garbage
> ST: He told you what?
> KS: It's no good.
> ST: Wow, wow
> KS: You know what I mean?
> ST; That nigga, that.
> KS: I gave that thing to Noodles yesterday and Noodles ain't stop calling my phone! He says fuck them getting it all together, give me what the fuck and we can get now!
> ST: [Laughs] You talking about Noo?
> KS: Yeah
> ST: Noo don't play man, he get busy. Tell you that shit right now
> KS: Yo, yo Noo said, Noo said, yo bro, right now he said, K, man, fuck all that waiting.
> ST: Yeah, you can't wait, you gotta, you go waiting, waiting waiting, you losing you losing dividends that you could've had
> KS: Nah, Noo on some shit, like, like [Interrupts: Huh?] It a motherfucking monster
> ST: You said what?
> KS: Noo like, that shits a monster
> ST: Oh, it was a monster?
> KS: Yeah, it was a, it's a monster!
> ST: Oh, man, he, he, and he talking about it ain't
> KS: Yeah

23.     Based on my training and experience, I believe that in exchange set forth above,

SWINTON and S.T. discussed feedback SWINTON received regarding narcotics he distributed.

SWINTON expressed his belief that a customer wrongly reported that the narcotics were of poor

quality ("nigga gonna tell me it's garbage") when the narcotics were actually of high quality

("this shit fire").  SWINTON also stated that he had distributed the same narcotics to another

8

customer, referred to as "Noodles" ("I gave that thing to Noodles yesterday") and that Noodles

was trying to obtain more narcotics from SWINTON because of the high quality ("Noodles ain't

stop calling my phone").

24.     On December 7, 2018, at 14:24 EST in session 677 intercepted over Target

Telephone-3, SWINTON spoke to an unidentified male who was utilizing phone number ███

███-1176.  During the call, the following conversation occurred:

> UM: Yo
> KS: Hey, where my scale at?
> UM: Nigger the scale is in the um the mother fucking, uh check the box
> KS: where?
> UM: Check the box
> KS: The box downstairs?
> UM: Yeah, Yeah, Yeah like check the box like little shit that's on the crate and shit
> KS: Call you when I get there
> UM: Alright, yeah, that's where it's at
> KS: Alright

25.     Based on my training and experience, I believe that in the call set forth above,

SWINTON's inquiry regarding his scale ("where my scale at") pertained to his desire to locate

his scale, a common tool utilized by traffickers to weigh narcotics for distribution.

26.     We also intercepted communications evidencing that HALL is a source of supply

for BUTLER.  For instance, on September 13, 2018, at 16:56 EST in session 7 intercepted over

Target Telephone 1, BUTLER spoke to HALL, who was using Target Telephone 2. The

conversation proceeded as follows:

> RH: Yo
> HB: Where you want me
> RH: Where you coming where you at
> HB: I'm coming down Laurel Hill
> RH: Um, Um you feel safe at Pistol Pete's or you want to do the gas station I'm pulling up on Hickory Street put it on the scale and get it out the car and I can meet you
> HB: Do you got any done
> RH: Huh, any what?
> HB: Anything done

RH: Yeah
HB: Uh, uh yeah oh just give me like 7 done out of that
RH: Yeah, yeah I got you I got you. It is drop too, so you ain't got to worry about it
HB: Alright
RH: Alright so what you want to do Pistol Pete's or the gas station
HB: Pistol Pete's
RH: Alright cause I'm on Hickory Street so I'll be right there
HB: Alright
RH: Alright

27. Based on my training and experience, I believe that in the above conversation, BUTLER and HALL discussed the distribution of narcotics. HALL updated BUTLER regarding his timeline ("pulling up on Hickory Street [,] put it on the scale and get it out the car and I can meet you"). BUTLER inquired whether HALL had any cocaine base to sell ("you got any done"), to which HALL replied in the affirmative ("yeah"). Based on my training and experience, powder cocaine can be cooked into or converted into cocaine base. Accordingly, terminology such as "you got any done" suggests that the narcotic under discussion is powder cocaine that is intended to be converted to cocaine base. BUTLER then ordered "like 7 done out of that," believed to be reference to seven grams of cocaine base. HALL agreed to sell BUTLER the cocaine base ("yeah I got you") and HALL's assurance, "it is drop too you so ain't got to worry about it", in this context is believed to be a statement to BUTLER that the cocaine base was of high quality. The two agreed to meet at Pistol Pete's to conduct the transaction.

28. On September 14, 2018, at 16:53 EST in session 241 intercepted over Target Telephone 1, BUTLER spoke to Andre SMITH. The conversation proceeded as follows:

HB: Hello
AS: Yo I got another 50 buyer for you
HB: I can't hear you
AS: I got another 50 cent buyer
HB: Ah shit. I got to get like ASAP, I'm trying to get it now
AS: Alright, I'm just letting you know
HB: Alright, alright, hell ya, that sounds good, let me do my job
AS: Alright

HB: Alright

29.     Based on my training and experience, I believe that in the above conversation, SMITH contacted BUTLER to refer a customer looking to purchase 50 grams of cocaine from BUTLER ("got another 50 cent buyer"). BUTLER indicated that he needed to obtain a resupply ("ah, shit. I got to get like ASAP, I'm trying to get it now").

30.     Immediately after session 241, BUTLER attempted to contact HALL in session 244 intercepted over Target Telephone 1 at 17:03 EST. Although HALL did not answer the call, I believe that the conversation set forth in session 241 regarding BUTLER's need to obtain a resupply of narcotics, followed immediately by a call to HALL, indicates that HALL is a source of supply for BUTLER.

31.     On September 23, 2018, BUTLER engaged in a text message conversation over Target Telephone 1 with HALL, who was using Target Telephone 2. The conversation proceeded as follows:

> RH: Yooo (session 2812, received at 2:17 EST)
> RH: It's around (session 2813, received at 2:18 EST)
> HB: I no (session 2841, sent at 9:21 EST)
> HB: He close (session 2842, sent at 9:21 EST)
> RH: I was letting you knw i hve some (session 2847, received at 10:17 EST)
> HB: okkk (session 2863, sent at 12:59 EST)

32.     Based on my training and experience, I believe that in the above text message conversation, HALL reached out to BUTLER to let him know he had a supply of narcotics to sell ("I was letting you knw I hve some").

33.     On September 24, 2018, at 13:00 EST in session 3045 intercepted over Target Telephone 1, BUTLER spoke to HALL, who was using Target Telephone 2. The conversation proceeded as follows:

> RH: Yo

HB: What's up bro?
RH: Ain't nothing what's going on with you?
HB: Alright, umm, this nigga ain't even answer his phone. What number you got?
RH: Who? Ah, Who?
HB: He out here somewhere?
RH: Oh, Tey?
HB: Yeah
RH: Ah, what number I got?
HB: Yeah
RH: I've been, I've been getting 40... I mean, but that's just niggas just buying regular shit
HB: Yeah, umm... what's the, what's the, what's the number on a buck?
RH: Umm, you know I'll give it to you for the same thing that I gave it to you before
HB: What? What you say 38?
RH: Yeah
HB: Alright, let me, let me... umm, I don't think I got that much on me right now
RH: Alright [UI] let me know
Talking over each other
HB: Hold up, hold up, matter of fact, I'm a need that, I'm a need the 50 regardless, cause I, um, I got somebody who want damn near that right now. So I' m a need that regardless
RH: Alright, you got to check? Alright

34.     Based on my training and experience, I believe that in the above conversation,

HALL and BUTLER discussed the purchase of narcotics, with HALL explaining to BUTLER

that he had "been getting 40," believed to be a coded reference for $40 per gram. Based on my

training and experience, this is a price consistent with per gram prices for cocaine. BUTLER

then inquired about the price for 100 grams ("what's the number on a buck"). HALL then

confirmed "38," which, based on my training and experience, represented a reduction in price for

purchasing larger amounts. BUTLER stated that he needed "50 grams regardless," believed to be

a reference to 50 grams of cocaine/cocaine base.

35.     On September 25, 2018, 19:55 EST in session 3550 intercepted over Target

Telephone 1, BUTLER spoke to SMITH. The conversation proceeded as follows:

HB: Hello
AS: Yo beloved
HB: Yeah, yeah
AS: You can grab another one of those ones from last night?
HB: You got a 50 piece?

AS: As long as it's the same one I'll take a 50 piece order.
HB: Yeah
AS: Alright
HB: Is it okay if we do it tomorrow?
AS: Yeah I'm not talking about now I'm just saying as long as it's the same thing it can wait until tomorrow.
HB: (UI)
AS: What?
HB: We're all good.
AS: You sound like you high.
HB: I am. I'm always high.
AS: Yeah bro. I got to go see Charmin in the morning so.
HB: I just seen him today.
AS: What happened?
HB: I seen him today.
AS: Yeah I got to go see him tomorrow. He said they found a development, a development in my case.
HB: Oh
AS: Yeah a motherfucker text me last night.
HB: Oh alright, let me know what's going on.
AS: Yeah you know.
HB: Alright. I will call around and come down tomorrow I'm a have to so I'm a go now I'm a see you all... (AS hangs up on HB)

36.   Based on my training and experience, I believe that in the above conversation, SMITH contacted BUTLER to obtain 50 grams of cocaine/cocaine base ("I'll take a 50 piece order").

37.   Shortly thereafter on September 25, 2018, BUTLER engaged in a text message exchange with HALL, who was using Target Telephone 2, that was intercepted over Target Telephone 1 that proceeded as follows:

HB: U still on deck (session 3553, sent at 19:57 EST)
RH: Yeah (session 3554, received at 20:10 EST)
RH: Wat u nd (session 3555, sent at 20:10 EST)
HB: Hold a buck tomorrow (session 3556, received at 20:11 EST)
RH: Kopy (session 3557, sent at 20:11 EST)
HB: yay yay (session 3558, received at 20:11 EST)

38.   Based on my training and experience, I believe that in the above exchange, BUTLER reached out to HALL to obtain cocaine/cocaine base ("u still on deck, wat u nd, hold a

buck tomorrow"). Based on BUTLER's reference to "a buck," I further believe that the quantity involved is a hundred grams, as this is common slang among drug traffickers to refer to a 100 gram quantity. Additionally, based on the timing of this exchange, which occurred shortly after BUTLER's conversation with SMITH in session 3550 in which SMITH sought to obtain 50 grams, it is further believed that BUTLER reached out to HALL to obtain narcotics for SMITH and others.

39.     On September 26, 2018, at 11:12 EST in session 3616 intercepted over Target Telephone 1, BUTLER spoke to SMITH.  The conversation proceeded as follows:

> AS: But I'm bout to head back and get back to my shit so
> HB: Ah, shit I could of had you... you still in Norwich?
> AS: Nah, I'm passing, um, fucking, I'm passing Lisbon
> HB: Damn... I should have thought about that shit, bro... I don't know why I didn't bring that shit up here with me, nigga. I just didn't and usually I do, so I can hit you when I go do my thing and move, but yeah I'm coming down about 1. Once you get, once I get her little man from work then I'm gonna jump on the highway, come grab that from you and then go do what i do
> AS: Alright
> HB: Hey yo, um um, um, I'm a little short from a 100 though, so if you give me, um, if you give me like [Background noise – UI] I need like 500, I got, I got like 1500 on me...42... I need like 500 to get the 100
> AS: Why
> HB: Cause you know it's cheaper, I got like 5, I mean I need like 500 extra to get that 100 and if you give me the 5, I'll give you 14 back...
> AS: Alright
> HB: You feel me?
> AS: Yeah
> HB: I'll give you extra, you something extra
> AS: Alright
> HB: Cause a 100 is only 42 but, but, it rises, you know what I'm saying, but if I just get the 50, it ain't woo woo woo
> AS: Alright
> HB: So I'll see you, on the way down
> AS: Alright

40.     Based on my training and experience, I believe that in the above conversation, BUTLER and SMITH discussed BUTLER's desire to obtain money from SMITH so that

BUTLER could purchase additional narcotics ("I'm a little short from a 100 though, so if you give me, um, if you give me like [Background noise – UI] I need like 500, I got, I got like 1500 on me...42... I need like 500 to get the 100").

41.     Shortly after his conversation with Smith in session 3616, BUTLER sent an outgoing text message at 11:41 EST in session 3619 intercepted over Target Telephone 1, to HALL, who was using Target Telephone 2, which stated "B4 3."  BUTLER then sent another text message at 11:42 EST in session 3620 intercepted over Target Telephone-1 to HALL, who was using Target Telephone 2, which stated, "getting kid off bus at 1 then heading down I need that."

42.     Based on my training and experience, I believe that in these text messages, BUTLER updated HALL that he intended to be ready to purchase narcotics before 15:00 EST ("B4 3").

***Target Device 9***

43.     As stated above, law enforcement seized Target Device 9 from HALL on February 22, 2019.  Although the phone number for the device is unknown at this time, and thus it is unclear whether the device is assigned the phone number obtain from his grandmother in February 2019, the phone number he was intercepted using during the wiretap phase of the investigation, or a thus far unidentified phone number,  I believe, based on my training and experience, that Target Device 9 will likely provide useful information regarding HALL's criminal activity, including co-conspirator information and additional details about his drug trafficking activity, further suppliers, and potential corroboration of the evidence gathered through the court authorized intercepts.

44.     Based upon my training and experience, I know that persons who traffic in illegal narcotics often facilitate their criminal activity by the use of cellular telephones.  Drug traffickers often store phone numbers of their customers, associates or their sources of illegal narcotics within the electronic memory of their phones, including in contact lists, address lists, recent call lists and electronic calendars.  Drug traffickers are constantly on the move throughout the day, and by keeping their cell phones on their person, they can stay in frequent communication with their drug trafficking associates.  This way they can keep track of their associates' whereabouts if a drug transaction has been planned and is imminent.  When expecting a supply of narcotics, traffickers will use cell phones to stay in communication with their source of supply to facilitate the drug transaction.  Likewise, when expecting to sell narcotics to a customer, traffickers will use cell phones to stay in communication with their customers.  I have arrested drug traffickers and it is very common that cell phones are seized from the target's person at the time of arrest.  It is the ready mobility of cell phones that result in their frequent use as a tool of the drug trade.

45.     From my training and experience, I know that drug dealers typically use multiple phone numbers as a means to avoid detection by law enforcement. Drug dealers will often use one phone number for drug customers and a different phone number for drug suppliers. Using phones in this manner allows the dealer to insulate his/her supplier from detection if one of the drug customers provides information to law enforcement. Additionally, it is common for drug dealers to change cellular phones and telephone numbers regularly to avoid detection from law enforcement.

46.     Here, I believe Target Device 9 will contain evidence of the narcotics trafficking activities of HALL and his associates.   Based on information developed during this

16

investigation, HALL used a cellular telephone to facilitate his narcotics trafficking and other illegal activities.

### INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUESTED SEARCH WARRANT

47.     Based on my training, experience, I also know that the aforementioned Target Device 9 may have some or all of the capabilities that allow the phone to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA).  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

48.     With regards to Target Device 9, I request permission to search Target Device 9 for evidence relating to the Target Offense.

49.     Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by co-conspirators to communicate efforts to conduct criminal activities and it is likely that Target Device 9 was used by HALL to communicate with co-conspirators in the unlawful distribution of narcotics and/or firearms.  Furthermore, based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics and/or firearms, or conspire to do so.  Also based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics and/or firearms. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics and/or firearms, the quantity of narcotics and/or

firearms, as well as shipping packages within which the narcotics are concealed. Specifically,

based on my training and experience, I know the following information tends to exist on wireless

telephones, including phones used by those involved in the distribution of narcotics and/or

firearms:

    a.    the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

    b.    the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

    c.    descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

    d.    any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e.    any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f.    GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

    g.    saved searches, locations, and route history in the memory of said devices;

    h.    internet browsing history, to include, internet searches in the memory of said device; and

    i.    images and videos in the memory of said device.

50.    It is also requested that the Court authorize the retrieval of the above-described

stored electronic information by printing said stored electronic information or otherwise

reproducing said stored electronic information, by converting said stored electronic information,

or by copying said stored electronic information into storage in another device.  I am aware that in

some cases the software or equipment necessary to analyze wireless telephones in this manner is

not readily available to law enforcement during the course of the execution of a search and/or

arrest warrant.  Further, turning on wireless phones in a non-laboratory setting, where there is no

"jammer" active or radio shielding devices, permits additional signals to be received by the phone

and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

51.     It is also requested that each warrant be deemed executed once the items listed in **Attachment A** have been extracted from the phone and that further analysis of the seized items be permitted at any time thereafter.

52.     It is also requested that stored electronic information, data, information and images contained in Target Device 9 may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS OF TARGET DEVICE 9

53.     The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

54.     As described above and in **Attachment B**, the undersigned Affiant seeks permission to search and seize evidence that Target Device 9 might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

55.     Searching for the evidence described in **Attachment B** may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search

through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in **Attachment B**, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, FBI, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in **Attachment B**.

## CONCLUSION

56.     I submit that this affidavit supports probable cause for search warrant to search Target Device 9 for the items described in **Attachment B** for evidence of the Target Offense.

Respectfully submitted,

MARK H. ROBERTS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me on this _____ day of February 2020.

/s/ Sarah A. L. Merriam, USMJ

SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

One Apple iPhone inside a red and black case, which was seized on February 22, 2019 from Robert HALL (hereafter referred to as "Target Device 9"), that is presently in FBI's custody.   With respect to the above-described Target Device 9, this warrant authorizes the forensic examination of Target Device 9, including accessing all internal applications within Target Device 9, for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.   All records presently on Target Device 9 (description in Attachment A incorporated herein), and all deleted records which are able to be recovered from Target Device 9 as they related to violations of Title 21, United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute Narcotics) by Robert HALL and others, including:

    a.   the telephone number, ESN number, serial number, and SIM card number;

    b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory;

    c.   descriptions of time, date, locations, items, or events showing the commission of, or connecting a person to, the above-described crimes;

    d.   all records, however created or stored, which demonstrate ownership and use of the device;

    e.   all records providing identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the device;

    f.   any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

    g.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

    h.   saved searches, locations, and route history in the memory of said devices;

    i.   internet browsing history, to include, internet searches in the memory of said device; and

    j.   images and videos in the memory of said device;

2.   It is specifically authorized that stored electronic information, data, information and images seized may be reproduced by printing, converting, or coping into storage in another device.

3.   It is specifically authorized that the warrants will be deemed executed once the seized items are extracted or copied from the respective phone and that further analysis of the seized items extracted or copied from the respective phone is permitted at any time thereafter.